UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONNIE J. HIGHTOWER, | ) | CASE NO. 5:21-cv-1792 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| KEYSTONE AUTOMOTIVE INDUS., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendants for summary judgment. (Doc. No. 35 (Motion); Doc. No. 36 (Memorandum in Support).) Plaintiff opposes the motion (Doc. No. 37 (Brief in Opposition)), and defendants have replied. (Doc. No. 38 (Reply).) For the reasons set forth herein, defendants' summary judgment motion is granted and this case is dismissed.

**I. BACKGROUND**

Defendants, Keystone Automotive Indus. ("Keystone") and LKQ Corp. ("LKQ"), provide automotive parts to the collision repair industry. (Doc. No. 36-1 (Declaration of John Lanari) ¶ 2.[1]) LKQ is Keystone's parent corporation. (*See id.*) Defendants have facilities throughout the country and around the world. *See* https://www.lkqcorp.com (last visited Jan. 10, 2023).

On December 23, 2016, defendants hired plaintiff, Ronnie J. Hightower ("Hightower"), to

---

[1] John Lanari is employed by LKQ Midwest. Inc., an affiliate of Keystone and subsidiary of LKQ, as a Production Manager. (Doc. No. 36-1 ¶ 1.) Defendants represent, and plaintiff does not dispute, that plaintiff was employed by an affiliated company called "LKQ Triplett ASAP, Inc." (Doc. No. 36, at 2 n.1 (All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system).) Nonetheless, defendants do not disagree that, for purposes of summary judgment, they were plaintiff's employer(s). (*Id.*)

work as a Cut Pad Technician in defendants' Akron, Ohio facility. (Doc. No. 36-2 (Deposition of Ronnie J. Hightower), at 37.) Hightower is black. (Doc. No. 1 (Complaint) ¶ 9; *see* Doc. No. 36-2, at 50.) The decision to hire Hightower was made by Production Manager John Lanari, who is often referred to as "Junior." (Doc. No. 36-2, at 38; Doc. No. 36-3 (Deposition of John Lanari), at 6.) At all times relevant to this action, Hightower worked at the Akron facility and reported to Lanari. On January 26, 2018, Lanari promoted Hightower to the position of Engine Dismantler. (Doc. No. 36-2, at 38; Doc. No. 36-3, at 24.) As an Engine Dismantler, Hightower was responsible for dismantling car engines to resell the engine parts. (Doc. No. 36-2, at 39–40.)

In January 2019, Hightower suffered an injury at work wherein he slipped on a bolt on the floor and tore the meniscus in his left knee. (Doc. No. 36-2, at 22, 53.) As a result of the injury, Hightower's physician placed restrictions on his work prohibiting him from lifting more than five pounds or climbing steps and ladders. (*Id.* at 58–59.) To accommodate these restrictions, Hightower was permitted to perform "light duty" work in the quality control ("QC") department of the Akron facility. (Doc. No. 36-2, at 59–60; Doc. No. 36-3, at 30–31.) This light duty assignment consisted of bagging parts and buffing headlights and taillights. (Doc. No. 36-2, at 60; Doc. No. 36-3, at 30, 58.) After Hightower was moved to light duty work, his position as Engine Dismantler was left vacant. (Doc. No. 36-3, at 31–32.)

In March 2020, Hightower's physician recommended that he remove himself entirely from the workforce pending surgery on his knee. (Doc. No. 36-2, at 20–21, 56–57, 61.) According to Hightower, his physician was concerned that if he became sick, the surgery would have to be postponed. (*Id.* at 61.) At Hightower's request, defendants agreed to permit Hightower to take a leave of absence. (Doc. No. 36-1 ¶ 4.) Despite several surgeries, Hightower concedes that from

the date he was "take[n] off work" by his physician to the date of his deposition in September 2022, Hightower has remained completely unable to work due to his injury. (Doc. No. 36-2, 19–20, 21–22.)

Around the time Hightower went on his leave of absence in mid-March 2020, the COVID-19 pandemic began disrupting manufacturing and other businesses across the country and around the world.[2] *See CDC Museum COVID-19 Timeline*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 10, 2023).[3] While Hightower concedes that he has no knowledge of how the pandemic impacted defendants, defendants reported that revenue in 2020 was down "approximately 40% compared to the prior year." *See LKQ Corporation Announces Results for First Quarter 2020*, LKQ (Apr. 30, 2020), https://investor.lkqcorp.com/news/news-details/2020/LKQ-Corporation-Announces-Results-for-First-Quarter-2020-04-30-2020/default.aspx (last visited Jan. 10, 2023).

As a result of the pandemic and the economic consequences and uncertainty associated with it, defendants began identifying individuals worldwide for temporary furlough or permanent termination. (Doc. No. 36-4 (Declaration of Angie Beck[4]) ¶ 2.) Defendants' Akron facility was among the many facilities company-wide that were affected by the reduction in force ("RIF"). On

---

[2] In fact, Hightower testified that his physician recommended that he temporarily cease working out of fear that he might contract COVID-19, which would require his surgery to be postponed. (Doc. No. 36-2, at 61.)

[3] On March 11, 2020, the World Health Organization ("WHO") announced that COVID-19 was classified as a "pandemic." *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Jan. 10, 2023). On March 13, 2020, President Donald Trump declared a national emergency concerning the COVID-19 pandemic. *See* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak.

[4] Angie Beck is employed by Keystone as a Human Resources Business Partner. (Doc. No. 36-4 ¶ 1.)

March 30, 2020, defendants eliminated the positions of eleven individuals at the Akron facility. Of those eleven, four identified as black. (*Id*. ¶ 3.) On May 2, 2020, defendants eliminated the positions of twelve individuals at the Akron facility. Of those, one individual identified as black. (*Id*. ¶ 4.) On June 27, 2020, defendants eliminated eighteen positions in Akron, including the position occupied by Hightower before his leave of absence. Of those eighteen, six (including Hightower) identified as black. (*Id*. ¶ 5.) As of June 27, 2020, defendants had eliminated the positions of almost 5,000 individuals around the world. (*Id*. ¶ 6.)

Lanari was responsible for the decisions to eliminate positions at the Akron facility. Within the QC Department, Lanari eliminated a total of two positions—one was the position Hightower was occupying before his leave and the other was a position held by a white female. (Doc. No. 36-1 ¶ 5.) Lanari averred that he selected both positions for elimination because he was directed to reduce the headcount and he determined that neither position was necessary "from an operations standpoint." (*Id*.) Hightower's position in QC remains eliminated. (*Id.*; Doc. No. 36-3, at 52.)

Within the Engine Dismantling Department, Lanari initially (and temporarily) furloughed one of the three individuals working there. (Doc. No. 36-3, at 51–52.) The furloughed employee, who was white, was eventually brought back to work, along with some of the other employees who had been furloughed from other departments. (*Id*.) None of the employees who had been terminated, as opposed to furloughed (including Hightower), were returned to work because their positions had been eliminated. (*Id*. at 52–54.)

On September 17, 2021, Hightower filed the present action in federal court.[5] In his complaint, he sets forth the following claims: (1) race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); (2) disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112-12117 ("ADA"); and (3) race and disability discrimination under Ohio Rev. Code § 4112.02(A). (*See generally* Doc. No. 1.)

## II.   STANDARD ON MOTION FOR SUMMARY JUDGMENT

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190

---

[5] Prior to bringing suit, Hightower filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"). (Doc. No. 1 ¶ 19.) While Hightower alleges that the EEOC found probable cause that defendants discriminated against Hightower (*see id.* ¶ 20), the EEOC's "Right to Sue" letter attached to the complaint does not include a "probable cause" determination. At his client's deposition, Hightower's counsel advised that the "probable cause" allegation was erroneous. (*See* Doc. No. 36-2, at 84.)

(1991). In most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

### III. DISCUSSION

In their summary judgment motion, defendants contend that Hightower has failed to make out a *prima facie* case of either race or disability discrimination under federal or state law. Specifically, they argue that Hightower is not a qualified individual with a disability and that, in any event, he has not established that he was singled out for disparate treatment on the basis of either his race or a disability. Hightower focuses his response on defendants' stated reason for discharge—that Hightower was one of thousands of employees discharged as part of a COVID-19 prompted RIF—claiming it is a mere pretext for unlawful discrimination. (*See* Doc. No. 37, at 3 ["The issue is what [defendants] did to [Hightower], not the impact of COVID-19 on the world[.]"] (bolding omitted)).

#### A. Race Claims Under Title VII and Ohio Law

Title VII makes it an unlawful employment practice to "fail or refuse to hire or to discharge" an individual because of that person's race or sex. 42 U.S.C. § 2000e-2(a)(1). Similarly, Ohio Rev. Code § 4112.02(A) prohibits an employer from discriminating against an individual on a variety of bases, including race and disability. The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to employment discrimination claims brought under Ohio Rev. Code § 4112.02. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rts. Comm'n*, 421 N.E.2d 128, 131 (1981); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (holding that claims brought under Title VII and Ohio state law are examined using the same legal framework).

Where, as here, there is no direct evidence of discrimination based on any of the protected characteristics, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). A plaintiff must first establish the elements of a *prima facie* case. He must show:

1) [H]e is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

"When a plaintiff's position is eliminated due to a reduction in force (RIF),[6] the fourth prong is met by presenting additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Stipkala v. Am. Red Cross*, 215 F.3d 1327 (Table), 2000 WL 712378, at *4 (6th Cir. May 23, 2000) (per curiam) (quotation marks omitted). The duty to present a *prima facie* case is somewhat heightened in the context of a RIF because, "[a]s long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by [persons in a protected class]." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991). Discharge of a qualified employee within a protected class is not inherently suspicious because it is the nature of a RIF that some "qualified employees are going to be discharged." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) (citing *Barnes*, 896 F.2d at 1466).

If a plaintiff can establish each of the four elements of this heightened *prima face* case, the

---

[6] "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). While Hightower challenges the legitimacy of the RIF (and defendants' use of the RIF to eliminate his position), he does not dispute that his discharge occurred during a company-wide workforce reduction.

burden shifts to the employer to articulate a legitimate, non-discriminatory reason(s) for an adverse employment action. "If the employer meets its burden, the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citation omitted).

Defendants focus on the fourth element of the *prima face* case, as modified for RIF actions, suggesting that Hightower can point to no facts that, if believed, would establish that he was singled out on the basis of his race. In making its determination as to whether this requirement has been met, courts have been instructed that "[t]he guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of" race. *Barnes*, 896 F.2d at 1466. Defendants note that the record establishes that Hightower was discharged pursuant to a global RIF and his position was not replaced. Moreover, in the Akron facility where Hightower was employed, the RIF involved the elimination of a total of forty-one individuals, only eleven of whom (including Hightower) were black. (Doc. No. 36-4 ¶ 6.) Additionally, at least sixteen individuals who were black were not selected for the RIF. (*Id.* ¶ 7.) Finally, defendants highlight the fact that the same person who hired and promoted Hightower—John Lanari—was the person who made the decision to include his position for elimination in the RIF. "An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) (noting that "[t]his general principle applies regardless of whether the class is age, race, sex, or some other protected classification").

Hightower responds by pointing to these same facts and complaining that white employees were retained while his position was eliminated. (*See* Doc. No. 37, at 6.) However, "evidence that

9

one competent employee was retained over another is not sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [his] race in the RIF context." *Thompson*, 985 F.3d at 528 (quotation marks and citation omitted). Rather, to rely on the retention of individuals outside of the protected class, a plaintiff must show that he "possessed qualifications superior to those of" a worker outside the protected class in the same position as plaintiff. *Barnes*, 896 F.2d at 1466. Hightower cites no evidence, and makes no argument, that he possessed qualifications that were superior to the non-protected employees who were retained. Having failed to come forward with evidence that he was singled out for termination on the basis of his race, his race claims must fail.

If Hightower had managed to set forth a *prima facie* case of race discrimination, the burden would have shifted to defendants to articulate a legitimate non-discriminatory reason. As previously noted, defendants cite the company-wide RIF brought on by the economic consequences associated with the COVID-19 pandemic as the basis for the elimination of Hightower's position. (*See* Doc. No. 36, at 4–6 (citing company press releases reporting revenue losses during the pandemic).) "When work force reductions by the employer are a factor in the decision, 'the most common legitimate reasons' for the discharge are the work force reductions." *Barnes*, 896 F.2d at 1465.

Defendants having articulated a legitimate, non-discriminatory reason, the burden would have shifted back to Hightower to demonstrate that the proffered reason was merely a pretext for race discrimination. To establish pretext, a plaintiff may show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Thompson*, 985 F.3d at 522 (quoting *Carter*

*v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)).

Hightower attempts to meet this test by arguing that defendants "have simply not produced any evidence other than inadmissible hearsay as to profits or loses in Akron . . . there is no economic substantiation for a (RIF) in Akron." (Doc. No. 37, at 5.) Of course, an employer's burden is one of production, not of persuasion; it need only state a reason, not prove one.[7] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *see Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment," (citation omitted)). Defendants have easily satisfied this limited burden of production. "When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012). At this stage, it is not enough for the plaintiff to merely question the reasons given by his employer. Rather, the plaintiff must affirmatively prove that the reasons are "*in fact a coverup for a racially discriminatory decision*." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517, 519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("It is not enough, in other words, to *dis* believe [sic] the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (emphasis in original) (citation omitted)). Accordingly,

---

[7] To the extent Hightower argues that defendants cannot rely on financial records filed with the SEC, including company press releases that report on those financials, such evidence would be admissible under Fed. R. Evid. 803(6) and 807. And, even if the press releases, themselves, were not excepted from federal hearsay rules, defendants are correct that the Court may consider such evidence on summary judgment as there is no indication that defendants would be unable to reduce the evidence to an admissible form during trial. *See Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (at summary judgment, a court may consider evidence not in an "admissible form" if its "contents [are] admissible").

11

the fact that Hightower disbelieves defendants' stated reason is insufficient to establish pretext.[8] *See id.*

Hightower also maintains, without any record support, that he had "seniority over his white contemporaries who still maintain their positions[.]" (Doc. No. 37, at 6.) Yet, Hightower offers no evidence to suggest that seniority was a factor in the RIF decisions, and, in any event, seniority does not necessarily equate with superior qualifications. Rather, Lanari averred, in undisputed fashion, that he identified Hightower's QC position for elimination because he determined that his position, as well as the position held by a white female, were not essential to the operations of the facility. (Doc. No. 36-1 ¶ 5.) In his own deposition, Hightower conceded that he had no information on what process defendants undertook to identify the need to eliminate any position, including his own. (Doc. No. 36-2, at 74.) While Hightower may believe that seniority should have been considered, his unsupported belief that he had more seniority than other unidentified white employees who were retained does not support an inference of unlawful race discrimination. *See Norbuta v. Loctite Corp.*, 1 F. App'x 305, 314–15 (6th Cir. 2001) ("It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized. . . . [Plaintiff] must provide evidence not that [defendant] could have made a business decision that others think more fair, but that [defendant] made the decision to terminate

---

[8] Hightower also seems to argue that defendants' stated reason fails because they have not established that there was an independent financial necessity at the Akron facility to support its inclusion in the company-wide RIF. (*See* Doc. No. 37, at 5.) Hightower cites no authority for the proposition that an employer relying on an economically driven, company-wide RIF must prove an independent economic necessity at each individual facility and the Court is aware of none. To the extent that such evidence was necessary, Lanari offered undisputed testimony that production at the Akron facility during the pandemic substantially decreased. (Doc. No. 36-3, at 33–34; *see id.* at 33 [The pandemic "took my production levels down to – it cut me well over – I think I went down to maybe around 30%"].)

him because of his membership in a protected class"); *see also Browning v. Dep't of the Army*, 436 F.3d 692, 697 (6th Cir. 2006) (holding that a supervisor's decision to value certain criteria higher than other criteria, such as experience, in a hiring decision cannot give rise to an inference of pretext).

Finally, Hightower speculates—again, without any record support—that defendants discharged him to avoid paying benefits associated with the workers' compensation claim he filed in connection with his knee injury. (Doc. No. 37, at 4.) He surmises that defendants, who he claims were self-insured for purposes of workers' compensation, were "taking a big financial hit and wanted out. What better than to create the pre-text of [COVID-19] and the pandemic." (*Id.* at 3, 5.) "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). This final theory, which relies on pure conjecture and speculation without a shred of probative evidence to substantiate it, is woefully insufficient to generate a genuine issue of material fact on the subject of pretext.[9] *Chappell v. GTE Prod. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination."); *M.T. v. Saum*, 7 F. Supp. 3d 701, 704 (W.D. Ky. 2014) ("Mere speculation will not suffice to defeat a motion for summary judgment." (citation omitted)); *see also Anderson*, 477 U.S. at 256 (a plaintiff defending a properly supported summary judgment motion must come forward with significant probative evidence

---

[9] Even if true (and properly supported by probative evidence), the fact that defendants discharged him to avoid paying his workers' compensation claim would not support a finding that Hightower was singled out on the basis his *race*, or that defendants' stated reason for discharge—the pandemic-based RIF—was merely a pretext for unlawful *race* discrimination. As explained in detail below, the accusation also does not support Hightower's disability claims.

13

tending to support the allegations in the complaint).

Viewing the evidence in a light most favorable to Hightower, the Court must conclude that Hightower has simply not identified *any* evidence that would allow a reasonable jury to infer that defendants' proffered reason for selecting him for termination during its workforce reduction was a pretext for unlawful race discrimination. Hightower's federal and state race claims fail as a matter of law, and defendants are entitled to summary judgment on Count One (Title VII) and Count Three (to the extent it alleges race discrimination under state law).

### B. Disability Claims under the ADA and Ohio Law[10]

The ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As previously noted, Ohio Rev. Code § 4112.02(A) also prohibits disability discrimination.

Whether under the ADA or Ohio Rev. Code § 4112.02(A), to sustain a disability discrimination claim in the absence of direct evidence, a plaintiff must establish that (1) he possesses a legally cognizable disability; (2) he is otherwise qualified for the position despite his disability; (3) he suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other

---

[10] Defendants insist that Hightower has abandoned his disability claims because the "Legal Argument" section of his response brief contains a sub-section entitled "Race Discrimination," but does not contain a sub-section specifically addressing disability discrimination. (Doc. No. 38, at 5.) *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The Court finds that there is merit to defendants' argument. However, given that Hightower makes some arguments relative to his work-place injury, the Court will analyze Hightower's disability claims to determine whether they would otherwise survive summary judgment.

applicants or the disabled individual was replaced. *See Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007) (explaining that "Ohio's disability discrimination statute and the ADA employ the same analysis"). As was the case with Hightower's race claims, in the context of a RIF, the final prong is modified to require the plaintiff to come forward with some additional "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 420–21 (6th Cir. 1999) (quotation marks and citation omitted).

For purposes of summary judgment, defendants concede that Hightower's torn meniscus constitutes a "disability" under the ADA and Ohio law. (Doc. No. 36, at 15 n.11.) Nevertheless, defendants insist that Hightower is not a qualified individual with a disability. "An employee is qualified for [his] position if [he] can perform the essential functions of [his] job with or without a reasonable accommodation." *Thompson*, 985 F.3d at 524 (citations omitted).

Here, Hightower acknowledged that beginning in approximately mid-March 2020 when he first took a leave of absence and continuing to the present, he has been completely unable to work in any capacity due to his disability. (Doc. No. 36-2, at 19–22.) He also testified that both of the positions he previously occupied—quality control and engine dismantling—required on-site attendance. (*Id*. at 40, 60.) Because Hightower admitted that he could not return to work in any capacity—notwithstanding multiple surgeries—and his positions both required on-site participation, he cannot establish that he is a qualified individual with a disability for purposes of the ADA or state law. *See also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (acknowledging the general rule that "regularly attending work on-site is essential to most jobs,

especially the interactive ones[,]" and that this rule "aligns with the text of the ADA"); *see, e.g., Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 402 (6th Cir. 2017) (finding plaintiff was not a qualified individual with a disability where the record was "replete with evidence showing that Gamble was unable to return to work throughout his disability leave, at the time that he was terminated, or during the pendency of this litigation. He has further admitted to being completely disabled, unreleased to work by his doctor, and unable to regularly attend his job"). For this reason alone, Hightower cannot make out a *prima facie* case of case of disability discrimination, and his disability claims are subject to summary dismissal.[11]

Hightower's disability discrimination claims also fail because he cannot establish that the decision-maker had any knowledge of his disability. It is well settled that "an employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability[.]" *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013) (citing, among authority, *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996) (holding that plaintiff could not establish a *prima facie* case of disability discrimination because he had failed to show that the members of a review board that made the ultimate decision to terminate him knew of his disability)).

In this case, it is undisputed that Lanari was the sole decision-maker regarding the elimination of positions, including Hightower's, in the Akron plant. (Doc. No. 36-1 ¶ 5; *see* Doc.

---

[11] Without citing any authority, Hightower argues that he "is a qualified individual when he is on Temporary Total Disability because the inference is that he can or will be able to in the future perform all the essential duties." (Doc. No. 37, at 5.) Apparently, Hightower is arguing that his award of Temporary Total Disability represents a certification that he is a qualified individual with a disability for purposes of the ADA. The Court is aware of no case law that supports such a proposition. Further, while a temporary leave of absence can constitute a reasonable accommodation under the ADA, *see Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998), Hightower has not brought a failure to accommodate claim or even alleged that defendants failed to reasonably accommodate his disability. And, in any event, at his request, defendants permitted Hightower to take a medical leave of absence.

No. 36-3, at 50; *see also* Doc. No. 36-2, at 69–70.) There is no evidence that Lanari was aware that Hightower was disabled. (*See* Doc. No. 36-1 ¶ 3.) In his deposition, Lanari testified that he knew that Hightower suffered a work-place injury to one of his knees, though he did not know the specifics of the injury or even which knee was injured. (Doc. No. 36-3, at 29–31.) Lanari was also aware that Hightower was placed on work restrictions thereafter. (*Id*.) He further noticed that, after the injury, Hightower seemed to have "slowed down in his walk" and that, "[f]rom time to time[,]" Hightower walked with a limp. (*Id*. at 31.) Additionally, he was aware that Hightower was taking time off work to go to doctor's appointments. (*Id*. at 30.)

It is not enough that the decision-maker knows that an employee was injured or otherwise had an impairment that required restrictions. And while some symptoms may be "severe enough to alert" an employer to the fact the employee may be disabled, the Sixth Circuit has made clear that "[k]nowledge of an employee's symptoms . . . does not necessarily equate to knowledge of his disability." *Nilles*, 521 F. App'x at 369 (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)); *see also Brown v. BKW Drywall Supply, Inc*., 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability.")

Hightower points to the fact that, in addition to his light duty restrictions, he eventually took a leave of absence as evidence that Lanari must have known Hightower was disabled. He posits that "unless Lanari was brain dead or a liar, how could he testify that he did not know that [Hightower] was not at work for a period of months?" (Doc. No. 37, at 3.) However, the taking of a leave of absence, like the exhibition of certain visible symptoms, does not necessarily establish that the decision-maker was aware that the employee suffered from a disability. For example, in

17

*Nilles*, the employer knew that the employee "had taken two leaves of absence" and was "seeing several doctors and had had an MRI." 521 F. App'x at 369. But that was not enough to put the employer on notice of the employee's disability. *Id*. According to the Sixth Circuit, that information did not "strongly imply" that the employee had a "permanent disability"; rather, it was "just as, if not more, consistent with the perception that [the employee] simply was suffering from one or more temporary illnesses." *Id*.; *see also Burns*, 91 F.3d at 844 (employer must know that the "symptoms were caused by a disability *as defined by law*" (emphasis added)).

Here, Lanari was aware that Hightower suffered a workplace injury to his knee, that he was placed on work restrictions, that he exhibited certain symptoms "from time to time[,]" and that he was seeing physicians. He was also aware that Hightower requested, and was permitted to take, a leave of absence in mid-March 2020.[12] (Doc. No. 36-1 ¶ 4.) Lanari "was not privy to the reason(s) why, however, [and he explained that] numerous employees were taking time off from work or not working altogether at that point due to the [COVID-19] pandemic." (*Id*.) Hightower does not suggest that he informed Lanari of the reason for his leave of absence. And while Hightower admits that he was unable to work from the time he went on leave, he testified that the reason his doctor "took him off" work was because he did not want him to contract COVID-19 and have his surgery delayed. (Doc. No. 36-2, at 61.) These facts fail to establish that Lanari had enough information to know or reasonably infer that Hightower was suffering from a disability as defined by law. *See, e.g., Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015) (employee who suffered from spina bifida occulta failed to establish that the decision-maker was aware that the employee

---

[12] Accordingly, Hightower's suggestion in his opposition brief that Lanari testified he was unaware that Hightower had taken a leave of absence misrepresents the record. (*See* Doc. No. 37, at 3.)

18

was disabled, despite the fact that the employee had taken time off pursuant to the Family Medical Leave Act ("FMLA") and was placed on work restrictions).

Hightower cannot make out a *prima facie* case of disability discrimination for the additional reason that he has failed to come forward with evidence that, if believed, would establish that he was "singled out . . . for discharge" on the basis of any disability. *See Skalka*, 178 F.3d at 420–21. To the extent that he relies on his workers' compensation claim, the undisputed record evidence establishes that Lanari, the person who made the decision to eliminate his position as part of the RIF, was unaware that Hightower had filed a claim. (Doc. No. 36-3, at 37–38.) And Hightower's fanciful speculation, unadorned by *any* evidence, that defendants seized on the opportunity presented by the company-wide RIF to terminate Hightower so that they would not have to pay out on the workers' compensation claim is further belied by the fact that Hightower's position was not eliminated until the third round of terminations at the Akron facility.[13]

Ultimately, the Court finds that Hightower has failed to demonstrate the existence of genuine issues of material fact that, if believed by a jury, would establish that he was singled out for discharge on the basis of his disability. He has also failed to demonstrate that defendants' stated reason for discharge—a financially driven RIF—was merely a pretext for unlawful disability discrimination. Accordingly, as was the case with his race claims, Hightower's disability claims (Count Two and part of Count Three) fail as a matter of law, and defendants are entitled to

---

[13] It is worth noting that Hightower did not file a workers' compensation retaliation claim, or as discussed *supra*, identify evidence in the record that would support such a claim.

summary judgment on these claims, as well.[14]

## IV. CONCLUSION

For the foregoing reasons, defendants' summary judgment motion is granted in full and all of the claims in Hightower's complaint are dismissed with prejudice. This case is closed.

**IT IS SO ORDERED.**

Dated: January 31, 2023

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**

---

[14] Even though he did not allege in his complaint that he was disabled due to any mental impairments, Hightower testified in his deposition that he was disabled due to his knee injury *and depression*. (Doc. No. 36-2, at 23–25, 52–53.) Even if he had properly asserted a disability discrimination claim tied to depression, Hightower conceded in his deposition that he never told defendants that he was diagnosed with depression. (*Id*. at 57–58.) Additionally, Lanari testified that he was unaware that Hightower had been diagnosed with, suffered from, or filed a workers' compensation claim for, depression. (Doc. No. 36-3, at 38–39, 46.) To the extent that Hightower claims he was discriminated against on the basis of his depression, such a claim would find no support in the record.